380 April 2, 2025 No. 277

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOHNNY LEE WIDERMAN,
*Defendant-Appellant.*

Lincoln County Circuit Court
21CR06869, 20CR44850; A178347 (Control), A178348

Sheryl Bachart, Judge.

Argued and submitted June 17, 2024.

Meredith Allen, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Joanna L. Jenkins, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Jacquot, Judge.

JOYCE, J.

Reversed and remanded.

**JOYCE, J.**

Defendant caused a car crash that killed one person and injured three others. Shortly afterward, police obtained a blood sample from him to determine if he was driving while intoxicated. In this consolidated appeal from a judgment convicting him of nine offenses and from a judgment revoking his probation, defendant assigns error to the trial court's denial of his motion *in limine* to exclude an expert's report and testimony regarding that blood testing.[1] In that motion, defendant asserted that the admission of the results would violate his right to confrontation under Article I, section 11, of the Oregon Constitution and the Confrontation Clause of the Sixth Amendment to the United States Constitution. The state's evidence consisted of expert testimony from Dr. Spargo, a forensic toxicologist who reviewed the documentation and the results of tests that several other lab analysts conducted, as well as a report that Spargo created about the content of defendant's blood. Defendant argued that Spargo's testimony and report included hearsay statements of the analysts who had conducted the testing and, consequently, that the admission of that evidence in the absence of the analysts' testimony would violate his right to confront the analysts. On appeal, defendant renews those arguments. We conclude that the admission of Spargo's testimony and report violated Article I, section 11. Accordingly, we reverse and remand.

## I.  BACKGROUND

We begin with some of the relevant legal principles to frame the pertinent facts and legal arguments. Article I, section 11, of the Oregon Constitution protects a criminal defendant's right to confront, and, in particular, cross-examine, adverse witnesses.[2] *State v. Copeland*, 353 Or 816, 827-28, 306 P3d 610 (2013). Article I, section 11,

---

[1] The jury convicted defendant of second-degree manslaughter, two counts of third-degree assault, fourth-degree assault, driving under the influence of intoxicants (DUII), reckless driving, two counts of second-degree criminal mischief, and failure to carry or present a license. Based on the criminal conduct, the court also revoked defendant's probation in another case.

[2] Article I, section 11, of the Oregon Constitution provides that "[i]n all criminal prosecutions, the accused shall have the right to *** meet the witnesses face to face."

bars admission of an out-of-court "witness statement" for the truth of the matter asserted absent a showing that the declarant is unavailable and that the statement has adequate indicia of reliability. *Id.* at 823-24; *see also State v. Campbell*, 299 Or 633, 648, 705 P2d 694 (1985) (adopting, under Article I, section 11, the United States Supreme Court's reasoning in *Ohio v. Roberts*, 448 US 56, 65, 100 S Ct 2531, 65 L Ed 2d 597 (1980), regarding confrontation-based limitations on admission of hearsay statements). A "witness statement" excludes a statement by a public official that is "confined to matters that the officer is bound by administrative duty to report and do[es] not include investigative or gratuitous facts or opinions." *Copeland*, 353 Or at 839.

Article I, section 11, thus prohibits a trial court from admitting a "laboratory report without requiring the state to produce at trial the criminalist who prepared the report or to demonstrate that the criminalist was unavailable to testify." *State v. Birchfield*, 342 Or 624, 631-32, 157 P3d 216 (2007); *see also Copeland*, 353 Or at 826 (explaining that laboratory reports like those at issue in *Birchfield* are "witness statements" for purposes of Article I, section 11, because they "contain[] investigative facts and opinions involving suspected criminal activity").

The initial question in this case is, under Article I, section 11, when does the testimony of an expert witness contain out-of-court statements of others offered to prove the truth of the matters asserted? As the Oregon Supreme Court recently held, and our own case law also explains, when a witness lacks personal or specialized knowledge of facts but nevertheless testifies to the truth of those facts based on the statement of someone else, that testimony contains a "statement" of the other person for confrontation purposes. In this case, Spargo lacked personal or specialized knowledge of how the lab's analysts prepared and tested defendant's blood, but she nevertheless testified to how the analysts had done those things. Spargo's testimony included out-of-court statements by the analysts admitted to prove the truth of the matters asserted in those statements.

We also conclude that the lab analysts' statements do not fall within the historical exception to the category of

"witness statements" that the Oregon Supreme Court identified in *Copeland*, which is limited to statements by public officials. Consequently, the lab analysts' statements are witness statements for purposes of Article I, section 11. Because the state did not show that the lab analysts were unavailable and that the statements bore adequate indicia of reliability, the admission of Spargo's testimony violated Article I, section 11. Given that conclusion, we do not address defendant's argument that the admission of Spargo's testimony violated the federal Confrontation Clause.

## II.   FACTS AND PROCEDURAL HISTORY

With that background, we turn to the facts of this case. Defendant caused a car crash when he drove across the centerline and struck an oncoming car. The other car's driver and three passengers were injured, and one of the passengers died.

Following the crash, an officer arrested defendant for DUII and a paramedic at the scene drew defendant's blood for drug and alcohol testing. A police officer sent defendant's blood sample to NMS Labs, a large private laboratory in Pennsylvania, and requested that the lab conduct testing entitled "ProofPOSITIVE® Drug Impaired Driving/DRE Toxicology Panel (with Alcohol), Blood (Forensic)."

Before defendant's trial, the state sought to present testimony about that testing from Spargo, a forensic toxicologist from NMS Labs who also served as the lab's Assistant Laboratory Director and Assistant Director of Toxicological Services. Spargo did not participate in or observe any of the testing of defendant's sample. She reviewed records of all of the work that the lab's analysts had conducted on the sample. Based on her review, she wrote and signed a report that, she testified, was an "accurate representation of the results of testing that occurred in this case."

Defendant moved *in limine* to exclude Spargo's testimony and report on the ground that they depended on hearsay in the form of statements from lab analysts about the tests they had done on defendant's blood and the results of those tests. Defendant contended that, absent testimony from the analysts who conducted the testing of defendant's

blood, admission of Spargo's testimony and report violated his right to confrontation under both constitutions.

The state responded that the lab's procedures "ensure the quality of the toxicological analysis, and allow Dr. Spargo, as a toxicologist, to independently review the data and arrive at a conclusion." Given that, the state contended, only Spargo's testimony was necessary.

Because the lab's procedures are central to our analysis, we describe Spargo's testimony about them at the motion hearing at some length. Because her testimony was extremely detailed, our description nonetheless is only a summary of the points most relevant for our analysis. Spargo's testimony addressed the lab's procedures generally as well as what had happened to defendant's blood sample in particular.

Spargo testified that the lab uses an "assembly line" method of testing, which involves many lab employees and analysts. The various testing tasks for any particular sample are completed by different employees and analysts within different departments at the lab. When the lab receives a sample, an employee logs it into the system and attaches a unique bar code to it. Every time a sample is transferred to a new analyst, the analyst scans its bar code into the system to indicate where it is in the lab and what testing task the analyst is performing. The lab's computer system then logs the analysts' scanned information and creates a compilation showing the information that the analysts entered, which is called the chain of custody document.

She testified that, after the lab received defendant's blood sample, it was initially sent to the aliquoting department, where a small amount, an aliquot, was created for the initial screening test, which is a group of immunoassays that test for the presence of various drugs. The initial screening is qualitative, meaning that it yields a result of "present" or "absent" for each drug class, but it does not provide information about the concentration of each drug class that is present in the blood sample.

The remainder of defendant's blood was then sent to the alcohol testing department. Spargo testified about what

generally happens when the lab's analysts test for alcohol: The analyst "remove[s] some of the blood from the tube. It's put into another labeled tube \*\*\* with internal standard. That vial is then put on the instrument, where it is heated up, and the headspace, or the air above the liquid, is sampled and injected onto the instrument." A second analyst makes sure the vials are tested in the right order, and two additional analysts review the results of the batch to check the calibration curve and make sure the samples meet the criteria for reporting. Spargo testified that lab analysts twice tested defendant's blood for alcohol using that method.

After the analysts had finished the initial drug screen and had tested defendant's blood for alcohol, the blood was returned to the allocating department and aliquots were sent to other specialized testing departments for confirmatory tests based on the results of the initial screening. In those departments, she testified, analysts used liquid chromatography tandem mass spectrometry to test defendant's blood for amphetamines, methamphetamine, THC, and cannabis metabolites.

Each of the confirmatory tests requires an analyst to do "the preparation at the bench top, so extracting to get the sample ready to go on the instrumentation." Spargo's testimony at trial provided more detail about the benchtop preparation process for liquid chromatography tandem mass spectrometry. She explained that the analyst

> "start[s] out with blood, but [they] need to clean that sample up before [they] would inject it on the instrument. So [they] want to remove other components from that sample, because all [they're] targeting for this assay are [the specific compounds that are relevant to the test]. So, there are \*\*\* a series of chemical extractions that are performed. [The analyst] end[s] up with \*\*\* the final aliquot. And that is injected on a liquid \*\*\* chromatography tandem mass spectrometry instrument."

She further explained that, in the "series of chemical extractions" that the analysts perform, they are "starting with [the] aliquot, that's going to be blood" and "end[ing] up with" something different—"a clear, colorless solution" "that will be injected on the instrumentation."

After completing the bench-top preparation, the analyst puts the sample on or in the instrument. Another analyst initially looks at the resulting data and evaluates whether the results are appropriate, and a third analyst reviews the data a second time.

During the testing for THC and cannabis metabolites, Spargo testified, the analysts had a problem with the batch that included defendant's blood sample. Reading from the analysts' records, Spargo explained that "[t]here was a low internal standard with poor chromatography for the last low QC, so they would need to repeat all requests just for THC."

As a result, the analyst ran the test for marijuana metabolites a second time. This time, Spargo explained, the analyst reported diluting the sample: "[S]o half of the amount of blood was used. And then it is ultimately brought up to the same volume, so you would have to multiply * * * the result by two to get the reportable result." She explained that a note that the analyst had handwritten on the records is "standard scientific notation" indicating that

"instead of the * * * routine amount that is used, [the analyst] did a one plus one, which means * * * equal amounts. So you would divide it by two, meaning that half was the sample and half was what was used to bring it up to volume. I believe it is * * * blank blood for this assay although * * * I'm not entirely sure."

Spargo explained that, in this case, the repeated test did yield a result for one of the metabolites, but for the other metabolite the second test still did not yield a reportable result.

According to the lab's procedures, when an analyst completes any procedure, the analyst must identify what they have done by entering the information—who they are and what procedure they performed—into the computer system, which compiles the entries into the posting history report. The report is a chart that, for each task, states a Procedure Code; a description of the procedure; an "HBN"; a Condition Code ("CC")[3]; the name of the person or people

---

[3] The Condition Code Legend located at the bottom of the Posting History Report explains that when an analyst enters the notation "OK," it indicates that they "[c]ompleted" the testing procedure.

who performed the procedure; and the date. For example, as to amphetamines testing, the posting history report provides as follows:

| Procedure | Procedure Description | HBN | CC | User Name | Date |
|---|---|---|---|---|---|
| EDAMP01P | Amphetamines Prep | 7031595 | OK | Lippay, Helena / Becker, Victoria | 2/19/2021 |
| EDAMP01A | Amphetamines Analytical | 7033156 | OK | Hessler, Robert | 2/21/2021 |
| EDAMP01A-BREV | Amphetamines Analytical | 7033156 | OK | Deisher, Chelsey | 2/22/2021 |

Spargo testified that the testing machines are "interfaced" with the laboratory's case management software such that the results—that is, the data that the machine returns regarding the sample identified as defendant's that the analysts have prepared and placed on it—from each testing instrument are automatically recorded in the software. All of the "paperwork" related to the testing—which includes data about the testing of the individual sample and the whole batch as well as the analysts' notes about the sample and the batch—is saved in the lab's database program. For example, in this case, the cannabis metabolite analyst's handwritten note regarding dilution was included in those records.

After the lab analysts' testing was complete, the case went into a review queue for the Toxicology Department, where Spargo works. The case management software generates the final testing report—the report that Spargo signs—based on the results from the testing instruments. Before Spargo signs it, she looks at all the documentation that has been generated during the testing process. Among other things, she consults the chain of custody document that the case management system has created from the employees' scanning of the sample's barcode "to make sure that there is preparation and analysis that is occurring within each step, that those transfers happened." She looks at the posting history report to confirm "that there was preparation, analysis and/or calculation and review for each piece." She consults the data and lab notes stored in the database. Regarding the database materials, Spargo testified that, "in most

cases," she does "not look at the calibrators and the controls, because again they have been looked at twice already, as has the sample result. But I do look at that one more time, although I am not formally the technical reviewer, because that has happened." Once Spargo is "comfortable that everything has been accurately conveyed on the report," she signs it. When asked whether her report contained statements of the analysts, she said, "No. It's simply the result of their testing."

Spargo testified that, as to each of the tests performed on defendant's blood, the analysts who performed the test had followed the lab's procedures. Ultimately, she explained that her report "accurately reflect[s] the results of the testing" that the analysts did. She concluded that defendant's blood contained methamphetamine, amphetamine, Delta-9 Carboxy THC, and Delta-9 THC.

Following the hearing, the court issued an order denying defendant's motion to exclude the lab report and Spargo's testimony. The court determined that the report was an out-of-court statement from Spargo that was admissible as a business record under OEC 803(6). It found that Spargo's testimony and report were based on her own "personal knowledge." The court reasoned that, "because Dr. Spargo is the analyst, the author of the report, and [was] available to be cross-examined regarding her findings" her report and testimony did not violate defendant's state and federal confrontation rights.[4]

At trial, the state presented Spargo's report and testimony, which was similar to her testimony at the hearing. She testified about how the analysts tested defendant's blood for alcohol. She explained that, during the confirmatory tests, the analysts used quality controls and calibrators, and she explained to the jury how the analysts prepared defendant's blood for testing and tested it. She explained what had happened during the confirmatory test for THC and marijuana metabolites and that the analysts had been able to run a second test that resulted in a reportable result

---

[4] Under OEC 403, the court excluded a section of the report entitled "reference comments," which stated that certain levels of substances in the blood correspond to certain levels of impairment. That section is not at issue on appeal.

of one metabolite but not the other. And she testified to the results of the analysts' testing.

When the state offered Spargo's report into evidence, defendant renewed his prior objection. As noted above, the jury convicted defendant.

On appeal, defendant assigns error to the trial court's denial of his motion *in limine* to exclude Spargo's lab report and testimony. Defendant renews his argument that the admission of her report and testimony violated his confrontation rights because both depended on witness statements from the "several handlers and analysts who did not testify."

The state argues that "Dr. Spargo's opinions and conclusions were based on her own independent review of the data generated by the testing instruments." In its view, her testimony and report did not contain any out-of-court statements because they did not quote or directly recite any words stated by someone else. And it contends that neither the report nor Spargo's testimony implicated defendant's confrontation rights under our reasoning in *State v. Ruggles*, 214 Or App 612, 167 P3d 471, *adh'd to as modified on recons*, 217 Or App 384, 175 P3d 502 (2007), *rev den*, 344 Or 280 (2008), because they were "based on [Spargo's] observations of the content of readings generated by a machine." *State v. Ruggles* (*Ruggles Reconsideration*), 217 Or App at 388.

We review the trial court's factual findings for legally sufficient evidence and its conclusions of law for legal error, *State v. Jackson*, 187 Or App 679, 681, 69 P3d 722 (2003), and reverse.

### III.   ANALYSIS

A.   *Out-of-Court Statements Admitted for the Truth of the Matter Asserted*

As noted above, Article I, section 11, bars admission of an out-of-court "witness statement" for the truth of the matter asserted absent a showing that the declarant is unavailable and the statement has adequate indicia of reliability. *Copeland*, 353 Or at 823. The provision thus applies to witness statements that qualify as hearsay, *Campbell*, 299

Or at 648, defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OEC 801(3).

When a witness's "testimony is merely a conduit for another person's statement of personal or specialized knowledge, then the testimony may be inadmissible hearsay if offered for the truth of the matter asserted." *State v. Bowman*, 373 Or 213, 225, ___ P3d ___ (2025). In other words, "the definition of hearsay is not limited to assertions presented with 'air quote' gestures or introduced by the explanation 'I heard her say.'" *Id.* at 231. "Although those classic cues may make it easier to identify possible hearsay, the definition is focused on whether the assertion was made other than by the declarant at trial" and was presented at trial to show the truth of the matter asserted. *Id.*; *accord U.S. Bank National Assn. v. McCoy*, 290 Or App 525, 533, 415 P3d 1116 (2018) (holding that a declaration contained hearsay from Wells Fargo's business records because, although the witness "does not couch her attestations in terms of what Wells Fargo's records 'said'[,] that is, she does not expressly reference an out-of-court statement," "it is apparent * * * that the attestations are based on [the witness]'s contemporaneous review of the contents of Wells Fargo's business records"). *See generally* Laird C. Kirkpatrick, *Oregon Evidence*, § 602.03 (7th ed 2020) (explaining overlap between hearsay and lack of personal knowledge); *Bowman*, 373 Or at 225 n 11 (same).

Consistent with that understanding, in a line of criminal cases beginning in the 1980s, we have held that testimony by a state's witness that recounts the process and results of testing is admissible if it is based on the testifying witness's personal knowledge of how the test took place, but that it must be excluded if it is not and if a hearsay or confrontation objection is raised. *See State v. Prose*, 308 Or App 167, 168, 478 P3d 606 (2020), *rev den*, 367 Or 709 (2021) (accepting the state's concession that, "although the pediatrician was entitled to rely on the results [of a urine test performed by someone else] to form her opinion, her testimony should not have been admitted as substantive evidence of the test results over defendant's hearsay objection"); *State v.*

*McCormack*, 92 Or App 84, 86-87, 756 P2d 1281, *rev den*, 306 Or 661 (1988) (reversing the trial court's exclusion of testimony on confrontation grounds where the testifying officer, who was not the officer who had administered the Intoxilyzer test to the defendant, nevertheless "was qualified to administer the test and had observed [the other officer] give it to defendant"; there was no confrontation violation because the testifying officer "would have testified about his own observations, not about out-of-court statements, and he would have been available for cross-examination"); *see also State v. West*, 145 Or App 322, 326-27, 930 P2d 858 (1996), *rev den*, 326 Or 43 (1997) (no confrontation issue where an officer, Coon, who was not the officer who had conducted field sobriety tests on the defendant testified that he had "observed the FSTs, that based on Coon's training, they were administered in accordance with protocols, and that Coon interpreted the results to indicate that defendant was intoxicated"); *accord State v. Knepper*, 62 Or App 623, 625-26, 661 P2d 560 (1983) (reversing the defendant's DUII conviction for a violation of OEC 703 (regarding testimony of expert witnesses) where an expert had testified to the result of a blood-alcohol test that he did not perform). Thus, when a witness lacks personal or specialized knowledge of facts but nevertheless testifies to the truth of those facts based on the statement of someone else, that testimony contains a "statement" of the other person for hearsay purposes and, equally, for confrontation purposes under Article I, section 11.[5]

---

[5] In *Bowman*, the Supreme Court explained the distinction between inadmissible hearsay and expert testimony under OEC 702 and 703, which allow an expert to testify to their own specialized knowledge and to opine based on (1) that specialized knowledge and (2) "hearsay and other inadmissible facts and data." 373 Or at 226. Under *Bowman*, facts or assertions presented for their truth that are neither within the witness's personal knowledge (OEC 602) nor within the witness's specialized knowledge (OEC 702) are hearsay. 373 Or at 226. Under OEC 702, an expert witness may testify to their own specialized knowledge. And under OEC 703, as long as it is within the witness's expertise, an expert witness may testify to an opinion based on facts and data that are hearsay. *Bowman*, 373 Or at 226. However, the hearsay facts and data that the expert relies on remain inadmissible for their truth. *Id.* ("Rule 703 does not 'render otherwise inadmissible evidence admissible merely because it was the basis for the expert's opinion.'" (Quoting *McCathern v. Toyota Motor Corp.*, 332 Or 59, 70, 23 P3d 320 (2001).)); *id.* at 227 ("Rule 703 does not exempt expert witnesses from the general prohibition against hearsay; an expert may not merely parrot the statement of another for its truth. And Rule 703 does not make hearsay admissible." (Internal footnote omitted.)).

The remaining question is what it means for a statement to be admitted for its truth. Our Supreme Court shed some light on that question in *Bowman*. The disputed testimony in *Bowman* was a testifying police officer's assertion that, according to an ophthalmologist, when a person displays horizontal gaze nystagmus, they see "like a baby." 373 Or at 218-19. The state argued that that testimony, which included an out-of-court statement of the ophthalmologist, had not been admitted for its truth, but rather had been admitted to explain the officer's expert opinion that, based on the defendant's nystagmus, she was impaired. *Id.* at 222. The court disagreed, explaining that the prosecutor had repeatedly asked the officer to make the disputed statement and that the prosecutor relied on the testimony "as if the proposition were true" and emphasized it in closing argument. *Id.* at 231.

In circumstances similar to those of this case, the United States Supreme Court recently explained when an out-of-court statement of a lab analyst is admitted for the truth of the matter asserted. Although we are not bound by United States Supreme Court precedent in interpreting the Oregon Constitution, the Court's reasoning may provide persuasive authority. *Campbell*, 299 Or at 648 (relying on reasoning of the United States Supreme Court in interpreting Article I, section 11, "on independent and separate state grounds"). In *Smith v. Arizona*, 602 US 779, 790, 144 S Ct 1785, 219 L Ed 2d 420 (2024), state crime lab analyst Rast had tested substances found in the defendant's possession and prepared lab notes that "documented her lab work and results" and a report stating her ultimate findings—that each of the substances that she tested contained usable amounts of drugs. Before the defendant's trial on drug charges, Rast stopped working for the crime lab, and the state notified the defendant and the court that it would instead call forensic scientist Longoni as its expert witness, noting that he would "provide an independent opinion on the drug testing performed by *** Rast." *Id.* Longoni had not been involved in the case before that point. *Id.* at 791.

Longoni reviewed Rast's report and notes. *Id.* At trial, he described the testing that Rast had conducted and

testified that Rast's testing had "adhered to 'general principles of chemistry'" and the lab's "'policies and practices.'" *Id*. After "telling the jury what Rast's records conveyed about her testing of the items, Longoni offered an 'independent opinion' of their identity"—that the substances contained usable quantities of various drugs. *Id*.

On appeal, the Arizona Court of Appeals rejected the defendant's confrontation argument, reasoning that Longoni had testified about "the underlying facts" regarding Rast's testing only "to show the basis for [Longoni's] opinion and not to prove their truth." *Id*. at 792 (internal quotation marks omitted). Thus, the question for the Court was whether the Confrontation Clause permitted the state to have Longoni relay to the jury the factual information that "Rast's records conveyed about her testing of the items" as the basis for his "independent opinion" of the substances' identity. *Id*. at 791. The defendant argued that Longoni's testimony contained hearsay and thus implicated the Confrontation Clause because "Rast's statements were conveyed, via Longoni's testimony, to establish that what she said happened in the lab did in fact happen." *Id*. at 793.

The Court rejected the state's argument that Longoni's testimony was non-hearsay, that is, that it did not include statements of Rast presented for the truth of the matter asserted. *Id*. 798. The Court held that, if the credibility or usefulness of an expert's opinions depends on the jury accepting as true the out-of-court statement of another person, then that out-of-court statement has been admitted for its truth. *Id*.

The Court observed that "Longoni, though familiar with the lab's general practices, had no personal knowledge about Rast's testing of the seized items. Rather, as his testimony makes clear, what he knew on that score came only from reviewing Rast's records." *Id*. at 796. In the quoted testimony, Longoni testified, among other things, that "the [standard lab] policies and practices *** were followed"; that "[t]he microscopic examination and the chemical color test" were used; and that there was "a blank done to prevent contamination, make sure everything was clean." *Id*. at 797. Based on those facts, among others, Longoni opined that the

tested substance contained a usable quantity of marijuana. *Id*. at 796-97.

The Court explained that all of Longoni's opinions "were predicated on the truth of Rast's factual statements." *Id*. at 781. "Longoni could opine that the tested substances were marijuana, methamphetamine, and cannabis only because he accepted the truth of what Rast had reported about her work in the lab—that she had performed certain tests according to certain protocols and gotten certain results." *Id*. at 798. And the jury could credit Longoni's opinions—his identification of the substances—"only because it too accepted the truth of what Rast reported about her lab work (as conveyed by Longoni). If Rast had lied about all those matters, Longoni's expert opinion would have counted for nothing, and the jury would have been in no position to convict." *Id*. Thus, "[t]he State's basis evidence—more precisely, the truth of the statements on which its expert relied—propped up its whole case. But the maker of those statements was not in the courtroom, and [the defendant] could not ask her any questions." *Id*.

In other words, the court explained, the state had "used Longoni to relay what Rast wrote down about how she identified the seized substances. Longoni thus effectively became Rast's mouthpiece. He testified to the precautions (she said) she took, the standards (she said) she followed, the tests (she said) she performed, and the results (she said) she obtained." *Id*. at 800. If Rast's statements were testimonial, the court concluded, they were inadmissible under the Confrontation Clause absent Rast's testimony; the defendant "had a right to confront the person who actually did the lab work, not a surrogate merely reading from her records." *Id*.[6]

Thus, in *Smith*, the Court reasoned that, if an expert witness lacks personal knowledge of case-related facts but testifies to those facts based on statements of others, and the utility and persuasiveness of the expert's testimony rests on the jury accepting the truth of those statements, the out-of-court statements have been admitted for their truth. *Id*.

---

[6] The court declined to reach the question whether Rast's statements were testimonial because it had not been decided below and the parties disputed its procedural posture. *Smith*, 602 US at 801. Thus, it remanded for the state court to make that determination before deciding whether Longoni's testimony should have been excluded. *Id*.

at 803. That is consistent with our Supreme Court's holdings in *Bowman* that, under the Oregon Evidence Code, testimony contains hearsay when it is "merely a conduit for another person's statement of personal or specialized knowledge," 373 Or at 225, and that the out-of-court statement in *Bowman* had been admitted for its truth because the prosecutor had sought and relied on it as if it were true, *id.* at 231. That is, when the case is litigated in a way that suggests to the jury or requires the jury to believe that out-of-court statements conveyed through witness testimony are true, the statements have been admitted for the truth of the matter asserted.

Thus, we conclude that, like the Oregon Evidence Code, Article I, section 11, prohibits the state from presenting facts to the jury through testimony of someone who lacks personal or specialized knowledge of those facts. That is consistent with the purpose of Article I, section 11, which, among other things, is to ensure that criminal defendants have an opportunity to cross-examine the witnesses on whose testimony they are convicted. *See, e.g.*, *Copeland*, 353 Or at 827-28 ("The framers were keenly aware that the involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse. The people adopted confrontation guarantees to ensure the reliability of that evidence by requiring in-court testimony and the opportunity for cross-examination." (Internal quotation marks, brackets, and citation omitted.)).

As the Court explained in *Smith*, the confrontation problem with "surrogate" testimony regarding scientific testing is that it denies the defendant an opportunity to show that, notwithstanding what the analyst—the person who knows what actually happened in the lab—was supposed to do and said that they did, they actually did something else. 602 US at 800. That opportunity may bring to light problems in testing processes that directly affect the accuracy of the results, which are being used to prove the defendant's guilt. *See id.* at 785-86 (Cross-examination "might have plenty to do in cases involving forensic analysis. After all, lab tests are 'not uniquely immune from the risk of manipulation' or mistake." (Quoting *Melendez-Diaz v. Massachusetts*, 557

US 305, 318, 129 S Ct 2527, 174 L Ed 2d 314 (2009).)); *id.* (Testimony by someone who did not observe or participate in the testing process "'could not convey what [the original analyst] knew or observed' about 'the particular test and testing process he employed'" and thus could not "'expose any lapses or lies on the [first] analyst's part,' or offer any insight into whether his leave-without-pay was the result of misconduct." (Quoting *Bullcoming v. New Mexico*, 564 US 647, 661-62, 131 S Ct 2705, 180 L Ed 2d 610 (2011) (bracketed material modified; second brackets added).)).

Given our understanding of Article I, section 11, defendant is correct that Spargo's testimony contained out-of-court statements from the lab analysts admitted to prove the truth of the matters asserted in those statements. As Spargo explained, her involvement with the case began after the analysts' testing, and their records, were complete. She reviewed the analysts' records—their statements, recorded in the lab's computer systems, of what they had done to defendant's blood—to learn what they had done to prepare defendant's blood for testing and how they had tested it.

Although she had direct access to the results from the testing instruments, that data could not provide her with personal knowledge of *how* defendant's blood was prepared and tested, that is, whether the analysts followed the lab's procedures as a factual matter and, consequently, whether the machine-generated results were accurate. Instead, she relied on the truth of the analysts' statements in the posting history report that they had conducted the various parts of the testing process according to the lab's procedures. She also relied on detailed assertions like the handwritten note saying that the analyst had diluted defendant's blood with something—Spargo thought it was "blank blood," but was not certain—in a certain amount when rerunning the confirmatory test for THC and marijuana metabolites.

As the state argues, it is true that, to some degree, Spargo could check the analysts' work by looking at the results in light of the quality control information and calibration data from the instruments.[7] However, Spargo's abil-

---

[7] However, Spargo testified that she did not routinely do that, because it had already been done by others.

ity to confirm the results of the test does not eliminate her reliance on the lab analysts' statements, because, without participating in or observing the analysts' work, she did not—and could not—know what the analysts had actually done to prepare defendant's blood for testing or how they had placed it in or on the testing instruments. Instead, she relied on her knowledge of what the analysts were supposed to do and their out-of-court statements from the posting history report and notes, in which they asserted that they had done those things. Based on those out-of-court statements, she testified to the jury that, as a matter of fact, the analysts *had* done those things.

Under OEC 702 and 703, Spargo was allowed to rely on the analysts' hearsay statements as the basis for an opinion on the contents of defendant's blood. *Bowman*, 373 Or at 225-26; *see also, e.g.*, *Prose*, 308 Or App at 168 (accepting the state's concession that, "although the pediatrician was entitled to rely on the results [of a urine test performed by someone else] to form her opinion, her testimony should not have been admitted as substantive evidence of the test results over defendant's hearsay objection"). But her reliance on them did not make those statements admissible through her testimony. *Bowman*, 373 Or at 227 ("Rule 703 does not exempt expert witnesses from the general prohibition against hearsay; an expert may not merely parrot the statement of another for its truth. And Rule 703 does not make hearsay admissible." (Internal footnote omitted.)). Under Article I, section 11, Spargo's assertions to the jury that the analysts had done the things that they said they had done constituted out-of-court statements admitted for the truth of the matter asserted.

The state contends that, contrary to our understanding discussed above, our reasoning in *Ruggles* controls in this case and establishes that Spargo's testimony and report contained no hearsay and presented no confrontation issue. As explained below, in light of the Supreme Court's recent decision in *Bowman*, we disagree.

Our decision in *Ruggles* includes an initial opinion, 214 Or App 612, and an opinion on reconsideration that modified the initial opinion. *Ruggles Reconsideration*, 217

Or App at 389 ("Reconsideration allowed; former opinion modified and adhered to as modified."). We thus recount the scope of the decision consistently with our explanation of it on reconsideration, and we quote parts of the original opinion that remained unmodified on reconsideration.

In *Ruggles*, the defendant was charged with driving under the influence of intoxicants. 214 Or at 614. A phlebotomist drew a sample of the defendant's blood and had it transported to a private lab, Oregon Medical Laboratory (OML), for blood-alcohol testing. *Id.* Several lab employees were involved in the moving and testing of the blood at the lab, including three technologists who, variously, created an aliquot, "set aside" the sample, and tested it using "a flame ionization detector in a gas chromatograph." *Id.* at 614-15. That machine "generated a printout of information about the content of the aliquot sample." *Id.* at 615.

After that process was complete, two "certifying scientists," Irford and Mollahan, reviewed "the chain of custody reports, testing printouts, and other records." *Id.* Mollahan then prepared a report stating that the blood sample was "ethanol positive at 0.113 g/dL" as "confirmed by gas chromatography." *Id.* at 615. The defendant moved to exclude the test results, and the court denied the motion. *Id.* The court admitted both the report and testimony of Mollahan describing the testing that the technologists had done and the results that they obtained. *Id.* at 615-16, 618-19.

On appeal, the defendant assigned error to the trial court's admission of Mollahan's report. *Ruggles Reconsideration*, 217 Or App at 388.[8] He argued that the admission of the evidence violated his confrontation rights because the report "'contained statements made by persons who were not available for cross-examination at trial.'" *Ruggles Reconsideration*, 217 Or App at 387.

---

[8] In our first opinion, we addressed both Mollahan's report and his testimony. On reconsideration, the defendant argued that we had failed to meaningfully engage with his arguments regarding the constitutional implications of Mollahan's foundational testimony about what the technologists had done with defendant's blood—what they did to store and test it. In the reconsideration opinion, we stated that the defendant had not preserved or raised on appeal the admissibility of Mollahan's testimony. *Ruggles Reconsideration*, 217 Or App at 388. Accordingly, we limited our holding to the report. *Id.*

We rejected that argument, reasoning that the only information that the report conveyed was a machine-produced test result. *Ruggles*, 214 Or App at 619. We compared the case to *State v. Weber*, in which a photo radar unit had produced a photograph of the defendant driving a car with a notation of the speed of the car on it. *Id.* (citing *State v. Weber*, 172 Or App 704, 709, 19 P3d 378 (2001)). In *Weber*, we had held that, even if the notation of the car's speed qualified as a "'statement,'" "it was generated by a machine, and not made by a person," so it was not hearsay. *Weber*, 172 Or App at 709 (quoting OEC 801). In *Ruggles*, we said that, like the notation in *Weber*, the report in *Ruggles* "was not about what an out-of-court declarant said; it was about what a testing machine indicated." *Ruggles*, 214 Or App at 619. We noted, "[t]here were no other markings or designations from any other OML employee on the report to attribute the statement of result to an out-of-court declarant." *Id.* Ultimately, we concluded, "the report's recitation of the testing results is based on Mollahan's observations of the content of readings generated by a machine. The report does not recite the testimony of out-of-court declarants so as to raise issues about the right to confront witnesses." *Ruggles Reconsideration*, 217 Or App at 387-88. Thus, we concluded, it did not violate either Article I, section 11, or the Confrontation Clause. *Id.* at 389.

As noted, the state contends that our reasoning in *Ruggles* controls in this case. Defendant responds that this case is not controlled by *Ruggles* because, (1) here, he preserved objections to both Spargo's report and her testimony; (2) even considering only her report, the report in this case contained more than the report did in *Ruggles* because it included "chain of custody, quality control, and methodological information"; (3) *Ruggles* has been superseded by more recent cases addressing Article I, section 11; and, (4) in any event, *Ruggles* is plainly wrong and should be overruled.

*Bowman*'s holding that testimony that is "a conduit for another person's statement of personal or specialized knowledge" may contain inadmissible hearsay, 373 Or at 225, is inconsistent with, and thus overrules, our holding in *Ruggles* that the report in that case contained no hearsay. The report in *Ruggles* stated that the defendant's blood

sample was "ethanol positive at 0.113 g/dL" as "confirmed by gas chromatography." 214 Or App at 615. The person who wrote the report, Mollahan, had not tested the blood; rather, he was a "certifying scientist" who reviewed "the chain of custody reports, testing printouts, and other records." *Id.* That is, Mollahan knew that the defendant's blood-ethanol content had been "confirmed by gas chromatography" because he had read the records provided by the technologists who had created an aliquot, "set aside" the sample, and tested it using "a flame ionization detector in a gas chromatograph." *Id.* at 614-15. Under *Bowman*, Mollahan's statement in the report that the ethanol content of the defendant's blood had been confirmed by gas chromatography was hearsay; it was "another person's"—the technologists'—"statement of personal *** knowledge"—that they had tested the defendant's blood according to the lab's procedures using gas chromatography and that was how the testing machine had reached the result of "ethanol positive at 0.113 g/dL." *Bowman*, 373 Or at 225; *Ruggles*, 214 Or App at 615.

In reaching the conclusion that the report contained no hearsay, we reasoned that "[t]here were no other markings or designations from any other OML employee on the report to attribute the statement of result to an out-of-court declarant." *Ruggles*, 214 Or App at 619. As the court explained in *Bowman*, that reasoning is incorrect. "[T]he definition of hearsay is not limited to assertions presented with 'air quote' gestures or introduced by the explanation 'I heard her say.'" 373 Or at 231. "Although those classic cues may make it easier to identify possible hearsay, the definition is focused on whether the assertion was made other than by the declarant at trial" and was presented at trial for the truth of the matter asserted. *Id.*

Thus, in *Ruggles*, even if the number displayed on the testing machine was not, itself, hearsay (because, as we noted, it came from a machine, not a person), the information that made that number probative of any relevant fact in the case—specifically, the information that the technologists had tested defendant's blood sample using gas chromatography and the number shown on the testing machine represented the result of that testing—was hearsay because

it conveyed knowledge of the technologists, not the testifying witness.

Given the Supreme Court's holding in *Bowman*, *Ruggles* does not change our conclusion that, in this case, the trial court erred in denying defendant's request for exclusion of Spargo's testimony and report. Even if the numbers in Spargo's report and testimony were not subject to exclusion because Spargo received that information directly through the computer system, the other facts contained in the report and her testimony—facts without which the numbers were not probative of defendant's impairment—were hearsay because they were based on the knowledge of the analysts, not Spargo. And those facts were admitted through Spargo's testimony and report for their truth.

B.   *Witness Statements*

Having concluded that Spargo's testimony and report contained statements of the lab analysts admitted for their truth, we next consider whether, under Article I, section 11, the analysts' statements constitute "witness" statements. In *Copeland*, the Supreme Court explained, based on an historical exception to the confrontation right, that "[r]ecords made by a public officer in the performance of an official administrative duty" that contain hearsay statements of the public officer "are not 'witness' statements that offend a defendant's confrontation right [under Article I, section 11,] if they are confined to matters that the officer is bound by administrative duty to report and do not include investigative or gratuitous facts or opinions." 353 Or at 839. In the course of explaining the evolution of that exception, the court explained that "'a record of a primary fact made by a public officer in the performance of official duty is or may be made by legislation competent *prima facie* evidence as to the existence of that fact.'" *Copeland*, 353 Or at 835-36 (quoting *Commonwealth v. Slavski*, 245 Mass 405, 140 NE 465, 469 (1923)). To the contrary, however, "'records of investigations and inquiries conducted, either voluntarily or pursuant to requirement of law, by public officers concerning causes and effects and involving the exercise of judgment and discretion, expressions of opinion, and making conclusions are

not admissible [in] evidence as public records.'" *Id.* (quoting *Slavski*, 140 NE at 469).

In *State v. Kini*, 305 Or App 833, 837, 473 P3d 64 (2020), we considered a well-developed argument by the state that the exception articulated in *Copeland* covered certain hospital records, which included blood-alcohol test results as well as a diagnosis of the defendant with "[a]cute alcohol intoxication" and other information. Leaving for another day the question of whether private business records—rather than official records like the return of service at issue in *Copeland*—could ever fall within the exception, we explained that the hospital records went well beyond reflecting "*only* facts that the declarant is duty-bound to report" and not "the types of opinions, exercises of judgment, or gratuitous or investigative facts that trigger the confrontation right." *Id.* at 847 (emphasis in original).

Here, the state asserts that the records in this case qualify for the exception set out in *Copeland*. We disagree. To the extent that the lab analysts' statements in this case qualify for any hearsay exception, it would be the business records exception, not the official records exception, a subset of which the court addressed in *Copeland*. 353 Or at 842. As we explained in *Kini*, it is not clear that the Supreme Court intended for its reasoning in *Copeland* ever to apply outside the context of official records. *Kini*, 305 Or App at 845-46.

Further, even assuming that *Copeland*'s reasoning could ever apply to private business records, rather than official records, the analysts' statements at issue here do not qualify for the *Copeland* exemption from the confrontation right. Records created during scientific testing to show what the tester is doing to the sample and how the tester reaches their result are "records of investigations and inquiries conducted" and they "concern[] causes and effects and involv[e] the exercise of judgment and discretion, expressions of opinion, and making conclusions." *Copeland*, 353 Or at 836 (internal quotation marks omitted). Those types of statements are witness statements subject to confrontation.

Accordingly, under Article I, section 11, the trial court erred in admitting Spargo's testimony and report over

defendant's confrontation objection. Because that evidence was central to the state's argument that defendant had driven while impaired, the error was not harmless.[9]

Reversed and remanded.

---

[9] We recognize the practical impact of this outcome means that the state, when it seeks to admit evidence of the kind at issue here, would have to call the many analysts involved in the testing process. That said, the confrontation clause works on its own demands, and does not neatly align with the reasons that labs like NMS structure their processes as they do.